UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| **CLEAR BLUE INSURANCE COMPANY,**<br><br>　　Plaintiff,<br><br>　　v.<br><br>**WALTER SCOTT PALLADINO,**<br><br>　　Defendant. | Civil Action No. _____ |

## COMPLAINT

Clear Blue Insurance Company complaining of Defendant Walter Scott Palladino alleges as follows:

## PRELIMINARY STATEMENT

1. This case concerns the misappropriation of more than 10,000 Clear Blue Insurance Company ("CBI") confidential documents by Walter Scott (Scott) Palladino, its Senior Vice President of Business Development, occurring while he was discussing and after he had accepted an offer to become the Chief Business Development Officer of a direct competitor of CBI. Palladino, who previously downloaded no more than an average of a few documents per day, downloaded over 10,000 confidential documents over a few weeks span during which he (a) was in discussions to become the Chief Business Development Officer of Obsidian Specialty Insurance Company ("Obsidian") and ultimately accepted that position, (b) remained employed with CBI for more than three weeks without disclosing to anyone that he had accepted that position with a competitor, and (c) established a cloud storage account with 2 terabytes of data storage capacity. The documents that Palladino took from CBI contain highly sensitive, confidential, and proprietary business information that would harm CBI and give Obsidian or any other competitor a distinct, unfair, and improper advantage in competing with CBI for business.

1

## PARTIES AND JURISDICTION

2. Clear Blue Insurance Company ("CBI") is an Illinois-domiciled property and casualty insurance company with its U.S. headquarters in Charlotte, North Carolina.

3. Scott Palladino is an individual who resides in Charlotte, North Carolina.

4. This Court has personal jurisdiction over Defendant Palladino based on his residency in North Carolina.

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 because CBI's claim under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §1836, et seq., arises under federal law, and this Court has supplemental subject matter jurisdiction over CBI's remaining state law claims pursuant to 28 U.S.C. §1367 because they are so related to CBI's federal DTSA claim that they form part of the same case or controversy and derive from a common nucleus of operative fact.

6. Venue is appropriate pursuant to 28 U.S.C. §1391(b)(1) because Defendant is a resident of Mecklenburg County, North Carolina.

## RELEVANT FACTS

7. CBI, along with its insurance company affiliates, comprises the Clear Blue Insurance Group, which offers property and casualty insurance throughout the United States, Puerto Rico, and the District of Columbia.

8. CBI is a risk-bearing insurance company, rather than an agent, broker, or other intermediary.

9. CBI specializes in insurance programs in which it delegates underwriting and claim-adjustment functions to key partners ("Programs"). CBI's business is sometimes referred to as insurance "fronting" because it allows partners to sell and administer insurance services even though the risk is ultimately insured by CBI and/or one or more of its reinsurers.

10. Such partners include managing general agents and program administrators, which provide underwriting, quoting, binding, communications, and policyholder services on behalf of CBI ("MGAs").

11. Partners also include third party claims administrators ("TPAs"), which provide claim adjustment and management service.

12. CBI also fully reinsures the assumed risks with a variety of reinsurance partners ("Reinsurers").

13. MGAs, TPAs, and Reinsurers are critical strategic partners for CBI ("Partners").

14. CBI's relationships with its Partners are a critical element of its business strategy, business operations, and business success, and the terms of such Partner relationships are non-public, confidential, and proprietary, and are competitively sensitive. Each of these relationships is subject to written and executed agreements not to disclose the terms of the relationship.

15. Insurance is a technical, financial services business that relies heavily on data, information, analyses, financial metrics, models, estimations, predictions, underwriting, compilations, and information analysis ("Data"). The Data created and compiled by CBI weighs heavily in determining the pricing and terms of contracts that CBI enters with Partners, which are heavily negotiated.

16. The wide spectrum and types of Data produced and used by CBI in its business are critical elements of its business strategy, business operation, and business success, and they are non-public, confidential, and proprietary, and competitively sensitive.

17. CBI prepares and uses a wide variety of contracts and agreements to produce its insurance Programs, including without limitation term sheets, non-disclosure agreements, general agency agreements (with MGAs), claims services agreements (with TPAs), and reinsurance

agreements (with Reinsurers) such as quota share reinsurance agreements, catastrophe reinsurance agreements, stop-loss reinsurance agreements, and facultative reinsurance agreements (collectively, "Program Contracts").

18. CBI's Program Contracts contain exhibits that include the Program-specific pricing, terms, conditions, limitations, underwriting guidelines, and other highly confidential, competitive information.

19. CBI maintains both signed and operative Program Contracts for existing Programs, as well as template Program Contracts that are used with new Programs.

20. Operative Program Contracts are non-public, confidential, and proprietary, and they contain competitively sensitive business terms and conditions including pricing and other key negotiable terms.

21. CBI's template Program Contracts contain strategic development analysis, market awareness reports, risk management analysis, and options for negotiation, and thus they are unique to CBI, non-public, confidential, proprietary, and competitively sensitive.

22. CBI creates and maintains various types of internal reports, memoranda, analyses, notes, studies, proposals, surveys, evaluations, and similar documents that contain key business information that is non-public, confidential, proprietary, and competitively sensitive ("Analyses").

23. CBI creates and maintains various lists and databases of its Partners and their Program Contracts ("Partner Lists").

24. CBI creates and maintains a business "pipeline" list of potential new Programs and Partners that are in various stages of readiness to matriculate into new Programs ("Pipeline Lists").

25. CBI's Partner Lists and Pipeline Lists are non-public, confidential, proprietary, and competitively sensitive.

26. CBI's Data, Program Contracts, Analyses, Partner Lists, and Pipeline Lists ("Confidential Information") are all non-public, confidential to CBI, proprietary to CBI, contain competitively sensitive information, and are the sole and exclusive property of CBI. CBI created that Confidential Information through many years of dedicated work and at substantial expense. If any of that Confidential Information were to be taken from CBI and used to benefit a competitor, it would be very seriously damaging to CBI.

27. CBI protects its Confidential Information in several ways. Such information is (i) not publicly available, (ii) stored and protected on CBI's secure SharePoint (document storage) system, which can only be accessed by an employee with access to the CBI network with an unique network password, (iii) safeguarded from external theft by a variety of network intrusion protections, and (iv) protected from internal theft by CBI's requiring all employees to adhere to both a Code of Business Conduct and Ethics and Employee Handbook that make clear that all such material is the sole property of CBI and require employees to keep such information strictly confidential and use such information only for CBI business purposes.

28. CBI's Employee Handbook, the latest version of which Palladino received in 2020, specifically states, among other things:

- "proprietary and confidential Company information . . . must be restricted to employees only and not become known to competitors";

- "[e]mployees are not to discuss with outsiders/competitors or use any Confidential Information or trade secret information without prior authorization from the Company";

- "[e]mployees are prohibited from disclosing such Confidential Information and from using such information for personal gain"; and

- the "Company takes steps to maintain the confidential nature of its confidential and proprietary information."

29. CBI's Code of Business Conduct and Ethics defines CBI's confidential information as all non-public information that might be of use to competitors or harmful to CBI or its customers, if disclosed, and may include (a) technical information about current and future products, services or research, (b) business or marketing plans or projections, (c) earnings and other internal financial data, (d) personnel information, (e) supply and customer lists and (f) other non-public information that, if disclosed, might be of use to our competitors or harmful to our suppliers, customers or other business partners. The Code of Business Conduct and Ethics states "*Employees must maintain the confidentiality of confidential information entrusted to them by Clear Blue, its suppliers, customers or other business partners, except when disclosure is authorized by the General Counsel, outside legal counsel or is otherwise required by applicable laws or regulations.*"

30. CBI delegates to its MGAs the authority to make underwriting and pricing decisions, but only within a certain "underwriting box" known as the Underwriting Guidelines. The variables and limitations that are included in the Underwriting Guidelines – which include, for example, policy limits, geographic/territory restrictions, and availability of exclusions and limitations on exclusions – are developed using the expertise, experience, industry and market information, and special insurance knowledge possessed by CBI personnel working with the respective Programs. The terms, features, variables, and limitations in each set of Underwriting Guidelines are non-public, highly confidential, proprietary, and competitively sensitive not only for CBI, but also for its Program Partners. CBI carefully guards the secrecy of the Underwriting Guidelines, and is obligated to do so pursuant to contracts with its Partners.

31. CBI and its MGA Partners sign separate non-disclosure agreements and have detailed non-disclosure/confidentiality provisions in their Program Contracts protecting, among other things, the confidentiality of the Underwriting Guidelines.

32. When CBI is contemplating entering into a new relationship with an MGA, CBI puts together a proposed program, consisting of an MGA, a TPA, and Reinsurers, and establishing the insurance product and Underwriting Guidelines. These proposed new Programs are some of CBI's most valuable pursuits of new business. The contents of the Programs are highly confidential competitive information. CBI's arrangements and contracts with the Program Partners contain confidentiality provisions for all parties.

33. At the time of Palladino's departure from CBI, it had approximately 10 new program proposals in process, and, as Senior Vice President of Business Development, Palladino was closely involved in each one of them.

34. In 2016, CBI hired Palladino to serve as its Senior Vice President-Business Development. He retained that title throughout his employment with CBI.

35. In that role, Palladino was responsible for sourcing, producing, and developing new business and Partners for CBI, and maintaining relationships with existing Partners, including being one of the principal customer-facing officers at CBI.

36. On June 1, 2022, CBI's Chief Executive Officer Jerome Breslin and its Chief Risk Officer James Mann met with Palladino to discuss his unsatisfactory job performance. They nonetheless gave Palladino a salary increase together with increased job duties.

37. On June 6 and June 7, 2022, Palladino missed important CBI Board of Director meetings in the Charlotte office. On June 8 and 9, when Palladino was questioned about missing the Board meetings, he stated that he was in business meetings in Chicago all week with a potential

7

Case 3:22-cv-00418-GCM   Document 1   Filed 08/18/22   Page 7 of 18

new Program partner. CBI later learned that Palladino was untruthful about being in Chicago all week and was actually – unrelated to business – playing golf in Wisconsin part of the week. On June 14, Mr. Breslin and CBI's EVP of Human Resources Rosa Vega met with Palladino and gave him a performance warning based on his missing the Board meeting and related events.

38. On June 16, 2022, Palladino downloaded to his company laptop <u>599</u> confidential CBI documents from the company's SharePoint server.

39. At least from March 2022 forward, Palladino was in discussions with Obsidian about Palladino leaving CBI and joining Obsidian.

40. On July 3, 2022, Palladino received a job offer from Obsidian.

41. Three days later, on July 6, 2022, Palladino purchased an Apple iCloud storage account with 2 terabytes of available storage.

42. The very next day, July 7, 2022, Palladino downloaded <u>9,294</u> additional confidential CBI documents from the company's SharePoint server to his company laptop. Upon information and belief, Palladino then transferred those documents to his new iCloud storage service.

43. On July 11, 2022, Palladino accepted Obsidian's job offer to work as Obsidian's Chief Business Development Officer. On that exact same day, Palladino travelled to Puerto Rico for CBI's offsite confidential executive strategy and business meetings that week.

44. On July 12, 2022 in Puerto Rico, Palladino attended CBI's executive-only (ten person), confidential strategic management meetings at which key strategic, operational, risk, and emerging market developments were discussed by the core executive leadership team. Palladino did not reveal to anyone that by then, he had already accepted a job with Obsidian. He participated in small executive/management meetings, and heard/participated in highly confidential strategic

8

and operational planning discussions among the core leadership team. During these meetings, he had already received and accepted Obsidian's job offer, set up a cloud storage account, and downloaded 9,893 CBI documents.

45. During July 2022, while he was still employed with CBI, Palladino had further communications with personnel at Obsidian, including its Chief Executive Officer (William Jewett) and Chief Operating Officer (Craig Rappaport), General Counsel (Emily Canelo), and others about his new position as Obsidian's Chief Business Development Officer.

46. On August 1, 2022, Palladino downloaded to his company laptop another 130 confidential CBI documents prior to 2:00 p.m. Upon information and belief, Palladino then transferred those documents to his iCloud storage. After the other employees in the office departed for the day, Palladino cleared out his desk and left behind in his office his company laptop, access cards, corporate credit card, and a resignation letter. Prior to leaving his work laptop at his desk, Palladino had removed from it all 10,023 of the CBI documents that he had downloaded as described above. Upon information and believe, Palladino had transferred all those documents to his iCloud storage.

47. August 2, 2022, Palladino sent an email to CBI CEO Breslin and EVP-HR Vega announcing his resignation but not revealing the identity of his new employer. CBI terminated Palladino's network access that day.

48. On August 3, 2022, Palladino stated that – despite having turned in all of his company equipment (and being surreptitiously employed by Obsidian) – he wanted to remain employed for a two-week period. Ms. Vega informed him that August 3 was his last day of employment.

49. On August 5, 2022, CBI personnel held a going-away party for Palladino at an uptown Charlotte restaurant and bar.

50. On August 8, 2022, Palladino disclosed for the first time that he was joining the direct competitor Obsidian.

51. Pursuant to company practice, and because Palladino left for a direct competitor, CBI began forensically examining his company laptop, the Microsoft 365 account that Palladino had used on behalf of CBI, and his activity on CBI's SharePoint document storage system. On the days from August 8 through August 10, CBI began discovering evidence of Palladino's document downloads that are described above, even though the documents had been removed from the laptop. In that same forensic review of Palladino's former laptop, CBI also first learned of Palladino's communications with Obsidian, including the acceptance of the job offer and the transfer of information about CBI. As the review continued, CBI learned about Palladino's establishing the 2 terabyte iCloud account.

52. Obsidian is a direct competitor of CBI. It entered the insurance "fronting" business in 2019, operates in the exact space as CBI, is emulating CBI's business model, offers the same products and services as CBI, and competes directly for the same business as CBI. In fact, when Obsidian entered the market in about 2019, it even modeled its website directly on CBI's website, to the point of incorporating portions of the exact same language, and even using a blue ocean wave image that is an almost exact copy of a blue ocean wave image featured prominently on CBI's website since 2016. Also, over the last several months, Obsidian has tried to hire three of CBI's senior personnel, including Palladino.

53. Palladino's downloads were unprecedented and extremely unusual, and he did not have any legitimate business need for any of the documents that he downloaded as described

above. Palladino's prior average download history was 0 to 15 documents per day, so these extremely large downloads of CBI confidential documents (599, 9,294, and 130 documents on three days) were extraordinary and alarming events.

54. The documents that Palladino downloaded in June and July were all Confidential Information, including term sheets, underwriting notes, reports, analyses, actuarial work, business pipeline reports, contracts, data, and non-disclosure agreements that CBI uses as a core resource in its business.

55. The term sheets are developed by CBI for use with potential new Program Partners, and they set out all the key substantive business terms of the arrangement before the contracts are finalized and executed. CBI creates these term sheets for all new and developing Programs when they get past the early stages and are approaching a high likelihood of becoming a contractual relationship. Every aspect of these term sheets is highly confidential.

56. The underwriting notes are comprehensive internal reports and memoranda that describe all aspects of a Program in one place. These documents form the basis for CBI's decision whether to agree to create a new Program. CBI has all-hands meetings just prior to signing Program contracts to discuss, dissect, and evaluate every aspect of the underwriting note. The underwriting notes contain key business and pricing terms, CBI's risk assessment, details on the insurance product being sold, details on CBI's Program partner, actuarial and loss reserving information, and predicted financial performance, among other things. These items are all specific to that particular Program with that particular Partner, and they are highly confidential and proprietary.

57. The actuarial work includes CBI's foundational actuarial analyses on potential and existing Programs and CBI's estimates of loss reserves over time. The actuarial reports are crucial

to CBI's business. They are specifically targeted to the Program at issue, and they provide critical analytical information guiding CBI's decision whether or not to commence or continue a Program. This information created by CBI allows CBI to predict whether a Program will be profitable or loss-producing

58. Contracts are key to Clear Blue's relationships with Partners, and contain not only intellectual property but critical business terms.

59. Data, generally, is critically important to CBI, because CBI is a data-driven financial services company. Program data, Partner data, financial data, and other types of Data are foundational elements of CBI's business.

60. The non-disclosure agreements show the potential Partners with whom CBI is in discussions, which makes them highly confidential.

61. CBI expended many years, and significant knowledge, expertise, experience, and money compiling its Confidential Information, and that Confidential Information is of immense value to CBI and critically important in the conduct of its business.

62. All of documents Palladino downloaded are Confidential Information and are highly confidential as they are, in effect, a complete roadmap for CBI's business. If they were to be obtained by a competitor they would harm CBI and give the competitor a distinct, improper, and unfair advantage in competing with CBI for business. This competition occurs on many factors in addition to pricing; it includes other terms such as reinsurance coverages, terms, and risk allocations; MGA relationship, terms, and risk allocation; TPA relationship, terms, and risk allocation; underwriting and claims delegations, policy limits, geographic/territory restrictions, and many other variable features. A competitor would also benefit unfairly from learning CBI's overall business plans and strategies and approach to the markets, including its current work to

turn potential clients into actual clients and to keep actual clients satisfied and perhaps increase business with them. A competitor would also learn all of the components and terms of existing programs and proposed programs, all of which are subject to confidentiality agreements with the other parties involved.

63. Palladino did not have permission to take the documents he downloaded (a) for his personal use, (b) for disclosure to and use on behalf of Obsidian, or (c) for any purpose other than conducting CBI business, which Palladino obviously was not doing as he was exiting the company. Palladino's downloading those documents for anything other than legitimate CBI business needs was forbidden by CBI's policies, to which Palladino agreed and confirmed each year (including as of January 2022).

64. On August 10, 2022, CBI sent letters to both Palladino and Obsidian demanding that they not use or disclose the documents that Palladino took from CBI, demanding their return, and demanding them to cease and desist from using or disclosing the documents. Both responded by letter to CBI on August 12 and protested that neither had any CBI documents. Notably, Palladino did <u>not</u> deny downloading documents from CBI, although he claimed in writing (and incredibly) that they did not come from CBI's SharePoint site but consisted "entirely of public information from the S&P Capital website." This claim is obviously false because the CBI documents do not exist on that website. Palladino further claimed not to know why the downloaded documents were not still on the laptop.

65. Since receiving the CBI letter on August 10, Palladino has had sufficient time to contact CBI leadership to explain this situation and resolve the matter, but – other than his defiant letter claiming his innocence – he has declined to do so.

## COUNT I – MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT, 18 U.S.C. §§ 1836, ET SEQ.

66. CBI incorporates the previous paragraphs as if fully set forth herein.

67. CBI's Confidential Information constitute trade secrets as defined under the DTSA, 18 U.S.C. § 1839(3).

68. The conduct described in the foregoing paragraphs constitutes "actual" trade secrets misappropriation by Palladino under the DTSA, 18 U.S.C. § 1836(b)(3).

69. Alternatively, the fact that Palladino refuses to admit that he has CBI's Confidential Information and refuses to assure CBI that he will not use CBI's Confidential Information amounts to a "threatened" trade secret misappropriation by Palladino under the DTSA.

70. CBI expended many years, and significant knowledge, expertise, experience, and money compiling its Confidential Information, and that Confidential Information is of immense value to CBI and critically important in the conduct of its business. CBI has been and is being harmed by Palladino's actual and threatened misappropriation of this trade secret information.

71. Palladino's misappropriation of CBI's trade secrets was and is willful and malicious.

72. CBI is entitled to exemplary damages under 18 U.S.C. §1836(b)(3)(D).

73. CBI is also entitled to the reasonable attorneys' fees that it incurs in this action under 18 U.S.C. §1836(b)(3)(D).

## COUNT II – MISAPPROPRIATION OF TRADE SECRETS UNDER THE NORTH CAROLINA TRADE SECRETS PROTECTION ACT, N.C. GEN. STAT. §66-152, ET SEQ.

74. CBI incorporates the previous paragraphs as if fully set forth herein.

75. Each piece of CBI's Confidential Information is a trade secret under N.C. Gen. Stat. §66-152 ("NC Trade Secrets Act").

76. Having expended many years, and significant knowledge, expertise, experience, and money compiling its Confidential Information, CBI's Confidential Information is of immense value to CBI and critically important in the conduct of its business. Its disclosure to a competitor would greatly damage CBI.

77. Given his position with CBI, and subject to CBI's policies, Palladino had and was given access to CBI's Confidential Information.

78. Palladino's downloading of CBI's Confidential Information for purposes not related to his work with CBI was a misappropriation of CBI's trade secrets in violation of the NC Trade Secrets Protection Act.

79. Palladino's conduct proximately caused CBI losses in an amount to be proved at trial.

80. Palladino's misappropriation and violation of the NC Trade Secrets Act was willful and malicious, and CBI is entitled to injunctive relief to prevent further harm to CBI by Palladino. Also, the outrageousness of Palladino's conduct entitles CBI to an award of punitive damages.

## COUNT III – VIOLATION OF THE NORTH CAROLINA COMPUTER TRESPASS ACT, N.C. GEN. STAT. §14-458

81. CBI incorporates the previous paragraphs as if fully set forth herein.

82. The permission that CBI provided to Palladino to access its Confidential Information did not extend to bulk downloads of that information – including without limitation term sheets, underwriting notes, actuarial work and analyses, data, contracts, and non-disclosure agreements that CBI has entered with its Partners and prospective Partners – in connection with Palladino's accepting a job with a competitor or for his use in that job with the competitor.

83. By bulk downloading CBI's Confidential Information for the purposes that he did, Palladino violated North Carolina's Computer Trespass statute, N.C. Gen. Stat. §14-458.

84. CBI was injured by Palladino's violation of the Computer Trespass statute in an amount to be proved at trial.

### COUNT IV – UNFAIR AND DECEPTIVE TRADE PRACTICES, N.C. GEN. STAT. §75-1, ET SEQ.

85. CBI incorporates the previous paragraphs as if fully set forth herein.

86. By engaging in the conduct described above, including the misappropriation of CBI's trade secrets, Palladino has engaged in unfair competition in violation of N.C. Gen. Stat. §75-1, et seq.

87. Palladino's unfair and deceptive conduct proximately caused CBI losses in an amount to be proved at trial.

### COUNT V – CONVERSION

88. CBI incorporates the previous paragraphs as if fully set forth herein.

89. By engaging in the conduct described above, Palladino converted for his own use, and denied CBI the exclusive use of, the Confidential Information that Palladino took from CBI.

90. CBI was damaged by Palladino's conversion in an amount to be proved at trial.

### COUNT VI – VIOLATION OF THE NORTH CAROLINA PROPERTY PROTECTION ACT, N.C. GEN. STAT. §99A-1

91. CBI incorporates the previous paragraphs as if fully set forth herein.

92. By engaging in the conduct described above, Palladino violated N.C. Gen. Stat. §99A-1 by wrongfully taking, and denying CBI the exclusive use of, the Confidential Information that Palladino took from CBI.

93. CBI was damaged by Palladino's violation of N.C. Gen. Stat. §99A-1 in an amount to be proved at trial.

94. CBI is also entitled to punitive damages for Palladino's violation of N.C. Gen. Stat. §99A-1.

**WHEREFORE, Plaintiff prays that the Court:**

1. As also requested in CBI's separate motion, enter a temporary restraining order:

    a. Requiring Palladino and anyone who has aided and abetted or benefited from his misappropriation to cease and refrain from accessing, using, disclosing, or transferring, any of the CBI Confidential Information.

    b. Requiring Palladino to turn over to CBI for imaging any and all computers, mobile phones, and other electronic devices capable of data storage in his possession or control from June 2022 to the present.

    c. Requiring Palladino to provide access to CBI to any and all cloud storage services to which he has access, including without limitation the iCloud account that he established in July 2022.

    d. Prohibiting Palladino from being employed by or otherwise working with Obsidian while the order is in effect.

    e. Requiring Palladino to provide to CBI copies of his email correspondence with representatives or personnel of Obsidian from June 1, 2022 to the present.

2. As also requested in the separate motion, set a motion and briefing schedule and hearing date for CBI's motion for preliminary injunction.

3. Enter a preliminary and permanent injunction:

    a. Enjoining Palladino and anyone who has aided and abetted or benefited from his misappropriation from accessing, using, disclosing, or transferring, any of the CBI Information.

    b. Enjoining Palladino from being employed by or otherwise working with Obsidian while the preliminary injunction is in effect.

    c. Requiring Palladino to turn over to CBI for imaging any and all computers, mobile phones, and other electronic devices capable of data storage in his possession or control from June 2022 to the present.

    d. Requiring Palladino to provide access to CBI to any and all cloud storage services to which he has access, including without limitation the iCloud account that he established in July 2022.

    e. Requiring Palladino to provide to CBI copies of his email correspondence with representatives or personnel of Obsidian from June 1, 2022 to the present.

17

Case 3:22-cv-00418-GCM   Document 1   Filed 08/18/22   Page 17 of 18

4. Award CBI compensatory, punitive, and exemplary damages in an amount to be proved at trial.

5. Award CBI treble damages in accordance with N.C. Gen. Stat. §75-16.

6. Award CBI it costs and attorneys' fees expended on this action, including attorneys' fees allowed under §75-16.1.

7. Award such other and further relief, whether at law or in equity as the Court deems just and proper.

Dated: August 18, 2022

By:   s/ John A. Zaloom
John A. Zaloom (N.C. Bar No. 30557)
Fielding E. Huseth (N.C. Bar No. 53121)
Katherine C. McDiarmid (N.C. Bar No. 54791)
Elizabeth A. Weisner (N.C. Bar No. 55029)
Moore & Van Allen PLLC
100 North Tryon Street, Suite 4700
Charlotte, NC 28202
Telephone: (704) 331-1000
Fax: (919) 416-8380
johnzaloom@mvalaw.com
fieldinghuseth@mvalaw.com
katherinemcdiarmid@mvalaw.com
elizabethweisner@mvalaw.com

*Attorneys for Plaintiff*