**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**

| |
|---|
| **CLEAR BLUE INSURANCE COMPANY,** |
| **Plaintiff,** |
| **v.** |
| **WALTER SCOTT PALLADINO,** |
| **Defendant.** |

**Civil Action No. _____**

**PLAINTIFF'S BRIEF IN SUPPORT OF ITS MOTION FOR**
**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

FACTS ................................................................................................................................ 2

LEGAL STANDARD......................................................................................................... 10

ARGUMENT ...................................................................................................................... 11

I.      CBI IS LIKELY TO SUCCEED ON THE MERITS BECAUSE
PALLADINO WRONGFULLY ACQUIRED CBI'S CONFIDENTIAL
FILES FOR UNJUST PERSONAL GAIN AND COMPETITIVE
ADVANTAGE. ................................................................................................ 11

A.  Federal DTSA Claim and NCTSPA Claim ...................................................... 11

1.  CBI's Trade Secrets at Issue. .................................................................... 11

2.  Palladino's Misappropriation of CBI's Trade Secrets. ........................... 14

B.  North Carolina Computer Trespass Statute .................................................. 16

C.  Interference with Property Rights Statute (N.C.G.S. §99a-1) ....................... 18

D.  North Carolina Unfair and Deceptive Trade Practices Claim ....................... 19

II.     CBI WILL SUFFER IRREPARABLE HARM IF INJUNCTIVE
RELIEF IS NOT GRANTED BECAUSE THE CONFIDENTIAL
MATERIAL AT ISSUE IS ESSENTIAL TO CBI'S BUSINESS. ..................... 20

A.  DTSA and NCTSPA violations ...................................................................... 20

B.  Other North Carolina Claims ......................................................................... 20

III.    CBI'S HARM OUTWEIGHS ANY HARM TO PALLADINO.......................... 21

IV.    THE PUBLIC INTEREST FAVORS GRANTING PRELIMINARY
INJUNCTIVE RELIEF..................................................................................... 22

V.     CBI SEEKS INJUNCTIVE RELIEF NECESSARY TO PROTECT ITS
SERIOUS AND LEGITIMATE INTERESTS. .................................................. 23

A.  Temporarily Enjoining Palladino from Using or Disclosing CBI's
Confidential Information and Requiring Palladino to Return Such
Information is Critical .................................................................................... 23

B.  Temporarily Enjoining Palladino from Employment with Obsidian Is
Appropriate and Necessary Under the Circumstances.................................... 23

CONCLUSION.................................................................................................................... 25

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff Clear Blue Insurance Company respectfully submits its brief in support of its Motion for Temporary Restraining Order.

## INTRODUCTION

This case involves the misappropriation and improper taking of more than 10,000 Clear Blue Insurance Company ("CBI") confidential and proprietary documents by Scott Palladino, its former Senior Vice President of Business Development, before, during, and after accepting employment with one of CBI's direct competitors. In the weeks prior to resigning from CBI, Palladino downloaded more than 10,000 non-public, proprietary, and confidential documents from CBI's network and purchased a personal iCloud account with 2 terabytes of cloud data storage capacity. At the time he downloaded these documents, he was in discussions to join – and ultimately agreed to join – Obsidian Specialty Insurance Company ("Obsidian") as its Chief Business Development Officer. Palladino remained employed at CBI over three weeks after he accepted the job with Obsidian without disclosing this move, even participating in CBI's off-site executive strategy meetings the day after he joined Obsidian.

The documents that Palladino took contain highly sensitive, proprietary, and confidential business information that would give any direct competitor, particularly Obsidian, a distinct, improper, and unfair advantage and would cause irreparable harm to CBI. CBI and Obsidian both operate in a segment of the insurance industry referred to as "fronting" program insurance. The model involves partnering with other entities to produce insurance programs, while utilizing reinsurance to allocate risk and economic benefits. CBI has developed its unique and highly successful business model over nearly a decade. Obsidian, in contrast, has operated in this space for slightly more than two years and would gain tremendous benefits from acquiring CBI's trade secrets, along with its other proprietary and confidential information.

1

Federal and state laws prohibit individuals, such as Palladino, from doing exactly what he did here. The evidence shows that Palladino misappropriated trade secrets in violation of the federal Defend Trade Secrets Act and the similar North Carolina Trade Secrets Protection Act. Even if trade secrets were not at issue, Palladino violated North Carolina's laws prohibiting computer trespass and interference with property. His conduct, moreover, amounted to unfair and deceptive trade practices in violation of North Carolina law.

Preliminary injunctive relief is necessary to protect CBI from irreparable harm from forever los[ing] its competitive business advantage or, at the least, a significant portion of its market share." See Barr-Mullin, Inc. v. Browning, 108 N.C. App. 590, 597 (1993). Federal and state courts in North Carolina have granted preliminary injunctive relief under similar circumstances. CBI therefore respectfully requests that this Court grant its requested relief.

## FACTS

Clear Blue Insurance Company, along with its insurance company affiliates, comprises the Clear Blue Insurance Group, which offers property and casualty insurance throughout the United States, Puerto Rico, and the District of Columbia. CBI is a group of risk-bearing insurance companies, rather than an agent, broker, or other intermediary. Mann Decl. ¶4.

### CBI's Unique Business Model in the Insurance Industry

CBI specializes in insurance programs in which it delegates underwriting and claim-adjustment functions to key partners ("Programs"). CBI's business is sometimes referred to as insurance "fronting" because it allows partners to sell and administer insurance services even though the risk is ultimately insured by CBI and/or one or more of its reinsurers. Klope Decl. ¶3. In doing so, CBI partners with various entities to sell and administer insurance and provide underwriting, quoting, binding, communications, and policyholder services ("Partners"). Mann Decl ¶¶5–9. CBI's relationships with its Partners are a critical element of its business strategy and

2

success.  Mann Decl. ¶10.  The terms of its Partner relationships are non-public, confidential, proprietary, and highly sensitive.  Id.  Each relationship is subject to written and executed agreements not to disclose the relationship's terms.  Id.

### CBI's Non-Public, Confidential, Proprietary, and Sensitive Business Information

Insurance is a technical, financial services business that relies heavily on data, information, analyses, financial metrics, models, estimations, predictions, underwriting, compilations, and information analysis ("Data").  Mann Decl. ¶11.  The Data created and compiled by CBI weighs heavily in determining the pricing and terms of contracts that CBI enters with Partners, which are heavily negotiated.  Id.  The Data is similarly critical to its business strategy and success and is non-public, confidential, proprietary, and highly sensitive.  Mann Decl. ¶¶12, 39.

CBI prepares and uses a wide variety of contracts to produce its insurance Programs, including term sheets, non-disclosure agreements, and reinsurance agreements, among many others (collectively, "Program Contracts").  Mann Decl. ¶13.  CBI's Program Contracts contain exhibits that include the Program-specific pricing, terms, conditions, limitations, underwriting guidelines, and other highly confidential, competitive information.  Mann Decl. ¶14.  CBI maintains both Program Contracts for existing Programs, as well as template Program Contracts that are used with new Programs.  Mann Decl. ¶15.  These documents contain competitively sensitive business terms and conditions including pricing and other key negotiable terms, strategic development analysis, market awareness reports, risk management analysis, and options for negotiation, and thus they are unique to CBI, non-public, confidential, proprietary, and competitively sensitive.  Mann Decl. ¶¶16–17.

CBI creates and maintains various types of internal reports, memoranda, analyses, notes, studies, proposals, surveys, evaluations, and similar documents that contain key business

information that is non-public, confidential, proprietary, and competitively sensitive ("Analyses"). Mann Decl. ¶18. CBI also creates and maintains various lists and databases of its Partners and their Program Contracts ("Partner Lists") and a business "pipeline" list of potential new Programs and Partners ("Pipeline Lists"). Mann Decl. ¶¶19–20. CBI's Partner Lists and Pipeline Lists are non-public, confidential, proprietary, and competitively sensitive. Mann Decl. ¶21.

CBI created its Confidential Information through many years of dedicated work and at substantial expense. Mann Decl. ¶41. If any of that Confidential Information were to be taken from CBI and used to benefit a competitor, it would be seriously damaging to CBI. Mann Decl. ¶¶20, 42.

CBI delegates authority to certain Partners to make underwriting and pricing decisions, but only within a certain "underwriting box" known as the Underwriting Guidelines. Mann Decl. ¶23. The variables and limitations include, for example, policy limits, geographic/territory restrictions, and availability of exclusions and limitations on exclusions. Id. CBI developed this through expertise, experience, industry and market information, and special insurance knowledge possessed by CBI personnel working with the respective Programs. Id. The Underwriting Guidelines are non-public, highly confidential, proprietary, and competitively sensitive not only for CBI, but also for its Program Partners. Mann Decl. ¶¶23–25.

**CBI's Security Measures to Protect its Confidential Information**

CBI protects its Confidential Information in several ways. Such information is (i) not publicly available, (ii) stored and protected on CBI's secure SharePoint (document storage) system, which can only be accessed by an employee who has logged into CBI's network with a unique network password, (iii) safeguarded from external theft by a variety of network intrusion protections, and (iv) protected from internal theft by CBI's requiring all employees to adhere to

both a Code of Business Conduct and Ethics and Employee Handbook that emphasize CBI's ownership of all such material and require employees to keep such information strictly confidential and use it only for CBI business purposes. Klope Decl. ¶26.

CBI's Employee Handbook, the latest version of which Palladino received in 2020, specifically states, among other things:

- "proprietary and confidential Company information . . . must be restricted to employees only and not become known to competitors";

- "[e]mployees are not to discuss with outsiders/competitors or use any Confidential Information or trade secret information without prior authorization from the Company";

- "[e]mployees are prohibited from disclosing such Confidential Information and from using such information for personal gain"; and

- the "Company takes steps to maintain the confidential nature of its confidential and proprietary information."

Klope Decl. ¶27, Ex. 10.

CBI's Code of Business Conduct and Ethics, which Palladino received as an employee, defines CBI's confidential information as all non-public information that might be of use to competitors or harmful to CBI or its customers, if disclosed, and may include (a) technical information about current and future products, services or research, (b) business or marketing plans or projections, (c) earnings and other internal financial data, (d) personnel information, (e) supply and customer lists and (f) other non-public information that, if disclosed, might be of use to our competitors or harmful to our suppliers, customers or other business partners. Klope Decl. ¶28, Ex. 11. The Code of Business Conduct states: "Employees must maintain the confidentiality of confidential information entrusted to them[.]" Id.

CBI carefully guards the secrecy of certain confidential information in additional ways. Regarding its Underwriting Guidelines, CBI and certain Partners sign separate non-disclosure

agreements and have detailed non-disclosure/confidentiality provisions in their Program Contracts protecting, among other things, the confidentiality of the Underwriting Guidelines. Mann Decl. ¶24. Regarding CBI's contracts with Program Partners more generally, confidentiality provisions apply to the parties. Mann Decl. ¶25.

**Timeline of Events Surrounding Palladino's Departure**

As CBI's Senior Vice President-Business Development, Palladino was responsible for developing new business and Partners for CBI, and maintaining relationships with existing Partners. Klope Decl. ¶¶8–9; Mann Decl. ¶¶26–27. He was one of the principal customer-facing officers at CBI. Klope Decl. ¶9. He was closely involved in all of CBI's new program proposals throughout 2022, which is known at CBI as the "pipeline." Mann Decl. ¶¶20, 26.

On June 16, 2022, Palladino downloaded to his company laptop <u>599</u> confidential CBI documents from the company's SharePoint document storage server. Klope Decl. ¶14. CBI has learned that as of that date, Palladino had been in discussions with Obsidian about Palladino leaving CBI and joining Obsidian for a few months. Klope Decl. ¶¶12–14. In context, in the months and years prior to June and July 2022, Palladino had previously downloaded an average of only **zero** to 15 documents per day. Klope Decl. ¶24.

On Sunday, July 3, 2022, Palladino received a job offer from Obsidian. Klope Decl. ¶13. On July 6, 2022 (right after the holiday weekend), Palladino purchased an Apple iCloud storage account with 2 terabytes of storage. <u>Id.</u> The next day, July 7, 2022, Palladino downloaded <u>9,294</u> additional confidential CBI documents from the company's SharePoint server to his company laptop. Klope Decl. ¶14. The evidence suggests that Palladino then transferred those documents to his iCloud storage service.

6

On July 11, 2022, Palladino accepted Obsidian's job offer to work as its Chief Business Development Officer.  Klope Decl. ¶13.  On that exact same day, Palladino travelled to Puerto Rico for CBI's offsite confidential executive strategy and business meetings that week.  Klope Decl. ¶21.  While in Puerto Rico, Palladino attended CBI's executive-only, strategic management meetings at which the core executive leadership team discussed key strategic, operational, risk, and emerging market developments.  Id.  Palladino did not reveal to anyone that he had already accepted a job with Obsidian.  Id.

During July 2022, while still employed with CBI, Palladino continued communicating with Obsidian about his new Chief Business Development Officer position.  Klope Decl. ¶13.

On August 1, 2022, Palladino downloaded to his company laptop another 130 confidential CBI documents.  Klope Decl. ¶14.  Upon information and belief, Palladino then transferred those documents to his iCloud storage.  See Klope Decl. ¶¶13–14.  At the end of the day, Palladino cleared out his desk and left his company laptop, access cards, corporate credit card, and a resignation letter.  Klope Decl. ¶22.  Before doing so, Palladino had removed from the laptop all 10,023 of the CBI documents that he had downloaded as described above.  Id.  Upon information and belief, he transferred all those documents to his iCloud storage.  See Klope Decl. ¶¶13–14.

On August 2, 2022, Palladino sent an email to CBI officers announcing his resignation without disclosing his new employer.  Klope Decl. ¶23.  CBI terminated Palladino's network access that day and his employment terminated the next day.  Id.; Mann Decl. ¶30.  On August 8, 2022 – about a week after resigning – Palladino disclosed for the first time to CBI personnel that he was joining CBI's direct competitor, Obsidian.  Klope Decl. ¶11; Mann Decl. ¶32.

Under the circumstances, CBI began forensically examining his company laptop, the Microsoft 365 account that Palladino had used at CBI, and his activity on CBI's SharePoint

document storage system. Klope Decl. ¶11. CBI discovered evidence of Palladino's download activity and later deletion of the files. Klope Decl. ¶¶11–15, 22. CBI also learned of Palladino's (a) communications with Obsidian, including his job offer and acceptance, and (b) his creation of his 2 terabyte iCloud account. Klope Decl. ¶13.

### Palladino's New Employer, Obsidian, Is CBI's Direct Competitor

Obsidian is a direct competitor of CBI. Mann Decl. ¶¶32–33. It entered the insurance "fronting" business in 2019, operates in the exact space as CBI, emulates CBI's business model, offers the same products and services as CBI, and competes directly for the same business as CBI. Mann Decl. ¶33. When Obsidian entered the market in about 2019, it even modeled its website directly on CBI's website, using some of the same language and near-identical imagery. Id.

### Palladino Exceeded His Authority in Acquiring the Confidential Documents

The documents that Palladino downloaded in June and July were all Confidential Information, including term sheets, underwriting notes, reports and analyses, actuarial work, business pipeline reports, contracts, data, and non-disclosure agreements that CBI uses as a core resource in its business. Klope Decl. ¶15; Mann Decl. ¶¶34–40. He had no need for those documents at that time for his work at CBI. Klope Decl. ¶ 24.

The term sheets are developed by CBI for use with potential new Program Partners, and they set out all the key substantive business terms of the arrangement before the contracts are finalized and executed. Mann Decl. ¶35. CBI creates these term sheets for all new and developing Programs when they are approaching a high likelihood of becoming a contractual relationship. Id. Every aspect of these term sheets is highly confidential. Id.

The underwriting notes are comprehensive internal reports and memoranda that describe all aspects of a Program in one place. Mann Decl. ¶36. These documents form the basis for CBI's

decision whether to agree to create a new Program.  Id.  CBI has all-hands meetings just prior to signing Program contracts to discuss, dissect, and evaluate every aspect of the underwriting note. Id.  The underwriting notes contain key business and pricing terms, CBI's risk assessment, details on the insurance product being sold, details on CBI's Program partner, actuarial and loss reserving information, and predicted financial performance, among other things.  Id.  These items are all specific to that particular Program with that particular Partner, and they are highly confidential and proprietary.  Id.

The actuarial work includes CBI's foundational and professional actuarial analyses on potential and existing Programs and CBI's estimates of loss reserves over time.  Mann Decl. ¶37. The actuarial reports are crucial to CBI's business.  Id.  They are specifically targeted to the Program at issue, and they provide critical analytical information guiding CBI's decision whether or not to commence or continue a Program.  Id.  This information created by CBI allows CBI to predict whether a Program will be profitable or loss-producing.  Id.

The non-disclosure agreements show the potential Partners with whom CBI is in discussions, which makes them highly confidential.  Mann Decl. ¶40.

All of these documents provide a roadmap for CBI's business.  Mann Decl. ¶42.  They could give CBI's competitors a distinct and unfair advantage in competing with CBI for business. Mann Decl. ¶¶22, 42.  A competitor would also benefit unfairly from learning CBI's business plans and strategies, including its current work to turn potential clients into actual clients and to keep actual clients satisfied and perhaps increase business with them.  Mann Decl. ¶42.  A competitor would also learn all of the components and terms of existing programs and proposed programs, all of which are subject to confidentiality agreements with the other parties involved. Id.

Palladino did not have permission to take the documents he downloaded (a) for his personal use, (b) for disclosure to and use on behalf of Obsidian, or (c) for any purpose other than conducting CBI business. Klope Decl. ¶29. Palladino's downloading those documents for anything other than legitimate CBI business needs was forbidden by CBI's policies, to which Palladino agreed and confirmed each year (including as of January 2022). Id.

**CBI's Letters to Palladino and Obsidian**

On August 10, 2022, CBI sent letters to both Palladino and Obsidian demanding that they not use or disclose the documents that Palladino took from CBI, demanding their return, and demanding them to cease and desist from using or disclosing the documents. Klope Decl. ¶30, Exs. 12–13. Both responded by letter on August 12 and protested that neither had any CBI documents. Klope Decl. ¶30, Exs. 14–15. Notably, Palladino did not deny downloading CBI's documents, although he claimed in writing (and incredibly) that they did not come from CBI's SharePoint but consisted "entirely of public information from the S&P Capital website." Klope Decl. ¶30. But the CBI documents do not exist on that website. Id. Palladino further claimed not to know why the downloaded documents were not still on the laptop. Klope Decl. Ex. 14.

Since receiving the CBI letter on August 10, Palladino has had sufficient time to contact CBI leadership to explain this situation and resolve the matter, but – other than his defiant letter claiming his innocence – he has declined to do so. Klope Decl. ¶30, Ex. 14.

## LEGAL STANDARD

CBI is entitled to injunctive relief if it establishes that "(1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm without the preliminary injunction; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest." Mountain Valley Pipeline, LLC v. Western Pocahontas Properties Limited Partnership, 918 F.3d 353, 366 (4th Cir. 2019) (citing Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20 (2008)).

## I. CBI IS LIKELY TO SUCCEED ON THE MERITS.

### A. Federal DTSA Claim and NCTSPA Claim.

CBI is likely to succeed on the merits of its claims under the Defend Trade Secrets Act ("DTSA") (18 U.S.C. § 1836) and the North Carolina Trade Secrets Protection Act ("NCTSPA"). Palladino misappropriated CBI's trade secrets when he wrongfully acquired approximately 10,023 confidential files right before resigning and going to work for a direct competitor. Klope Decl. ¶¶14–19, 22. Preliminary injunctive relief is appropriate when, as here, a plaintiff makes a "*prima facie* case for 'actual or *threatened* misappropriation of a trade secret[.]" Horner International Co. v. McKoy, 232 N.C. App. 559, 569–70 (2014) (quoting N.C.G.S. §66-154(a)); see also Arminius Schleifmittel GmbH v. Design Indus., Inc., No. 1:06-CV-00644, 2007 WL 534573, at *3 (M.D.N.C. Feb. 15, 2007) (citing Merck & Co. v. Lyon, 941 F. Supp. 1443, 1456–57 (M.D.N.C. 1996)) (noting that a plaintiff must make "a *prima facie* case that the defendant misappropriated [a] 'trade secret'").

Federal and state courts frequently consider DTSA and NCTSPA claims in tandem.[1] This Court should do so as well, given the similar application of the two statutes to this case.

### 1. CBI's Trade Secrets at Issue.

The 10,023 confidential files at issue all contain trade secrets. As set forth in detail in the Facts and in the Declarations and Complaint, the files taken comprise Partner Contracts, Program

---

[1] See Power Home Solar, LLC v. Sigora Solar, LLC, No. 20 CVS 7165, 2021 WL 2530984, at *11 (N.C. Super. Ct. June 18, 2021) (addressing claims under the "NCTSPA and the DTSA in tandem"); Herrmann International, Inc. v. Herrmann International Europe, No. 1:17-CV-00073-MR, 2021 WL 861712, at *14–15 (W.D.N.C. Mar. 8, 2021) (analyzing claims under the DTSA and the NCTSPA together).

Lists, Pipeline Lists, Data, Analyses, Underwriting Guidelines, as well as other term sheets, underwriting notes, actuarial work, and non-disclosure agreements.

The definition of "trade secrets" under the NCTSPA and DTSA supports CBI's position that its confidential files contained trade secrets. N.C.G.S. §66-152(3); 18 U.S.C. §1839(3). The differences in the definitions are immaterial in this action:

> NCTSPA (in relevant part): "[1] business or technical information"[2] that "[d]erives independent actual or potential commercial value from not being generally known or readily ascertainable . . . and [2] [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." N.C.G.S. §66-152(3).

> DTSA (in relevant part): "[1] financial, business, scientific, technical, economic, or engineering information"[3] that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable . . . [and] [2] [for which] the owner thereof has taken reasonable measures to keep such information secret[.]" 18 U.S.C. §1839(3).

CBI has specified with particularity its business and technical information at issue, that the information has independent commercial and economic value, and that it is not generally known or readily ascertainable. Klope Decl. ¶26; Mann Decl. ¶¶11–25, 35–42; see Horner International Co. v. McKoy, 232 N.C. App. 559, 568 (2014) (holding that the plaintiff identified trade secrets with "sufficient particularity"). CBI has submitted detailed factual Declarations from two employees with firsthand knowledge of the documents acquired by Palladino. See generally Klope

---

[2] The "business or technical information" under the statute includes "but [is] not limited to a formula, pattern, program, device, compilation of information, method, technique or process. . . ." N.C.G.S. §66-152(3).

[3] The "financial, business, scientific, technical, economic, or engineering information" under the statute includes "patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing[.]" 18 U.S.C. §1839(3).

Decl.; Mann Decl. One Declarant has also attached lists of documents and several redacted documents representative of the 10,023 documents at issue. Klope Decl. ¶¶16–19, Exs. 2–9.

State and federal courts in North Carolina have held the following are trade secrets: customer and client lists; financial information and financial calculators; proprietary programs; pricing and discounts, including pricing formulas; cost history information; product specifications and technical descriptions; analyses of competitors' products; contract terms; business plans; and algorithms and data.[4] CBI's confidential material at issue falls within these categories and similarly deserve trade secret protection.

CBI has implemented "reasonable measures" and "efforts" to "keep such information secret." 18 U.S.C.A. § 1839(3); N.C.G.S. § 66-152(3). "Absolute secrecy is not required." Barr-Mullin, Inc. v. Browning, 108 N.C. App. 590, 596 (1993) (quoting Q-CO Industries, Inc. v. Hoffman, 625 F. Supp. 608, 617 (S.D.N.Y. 1985)).

---

[4] See Addison Whitney, LLC v. Cashion, No. 17 CVS 1956, 2017 WL 1068164 *6 (N.C. Super. Ct. Mar. 15, 2017) (client lists); American Air Filter Co. v. Price, No. 16 CVS 13610, 2017 WL 485517, at *6, *10 (N.C. Super. Ct. Feb. 3, 2017) (proprietary programs, customer pricing, product information and specifications); Bite Busters, LLC v. Burris, No. 20-CVS-899, 2021 WL 1161316, at *8 (N.C. Super. Ct. Mar. 25, 2021) (customer lists); Computer Design & Integration, LLC v. Brown, No. 16 CVS 11847, 2017 WL 442691, at *10 (N.C. Super. Ct. Jan. 27, 2017) (financial information and contact lists); Biesse America, Inc. v. Dominici, No. 19 CVS 15033, 2019 WL 3916806, at *3 (N.C. Super. Ct. Aug. 19, 2019) (product pricing, including discounts, markups, and list prices); God's Little Gift, Inc. v. Airgas, Inc., No. 3:17-CV-00004, 2017 WL 4366751, at *3 (W.D.N.C. Oct. 2, 2017) ("the composition of current chains and businesses; the number and location of stores per chain; wholesale prices customers were being charged for helium; helium cylinder pricing for each chain; the contract terms for each chain"); Herrmann International, Inc. v. Herrmann International Europe, No. 1:17-CV-00073, 2021 WL 861712, at *14 (W.D.N.C. Mar. 8, 2021) ("client lists, financial and competitive data, analytical tools/techniques, and algorithms used to develop, maintain, and service new and existing clients"); ATI Industrial Automation, Inc. v. Applied Robotics, Inc., 801 F. Supp. 2d 419, 426 (M.D.N.C. 2011) ("cost history information; price lists; and confidential customer lists, pricing formulas and bidding formulas"); Philips Electronics North America Corporation v. Hope, 631 F. Supp. 2d 705, 721–22 (M.D.N.C. 2009) (business plan, financial calculator, product costs, and customer pricing information).

The documents containing the trade secrets are stored and protected on CBI's SharePoint (document storage) system and are not publicly available. Klope Decl. ¶26. CBI employees must enter at least two passwords to access the documents. The system is safeguarded from theft by a variety of network intrusion protections. In addition, all CBI employees must abide by the Employee Handbook and the Code of Business Conduct and Ethics directing employees to keep confidential specific types of documents, including the ones at issue.

Courts in North Carolina courts have affirmed or granted preliminary injunctive relief in several trade secrets cases involving similar security measures. In Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C., the plaintiff's security measures included "maintaining passwords on the computer system, not giving [every] employee a password, shredding of confidential documents, and requiring each employee to sign an employee handbook with a confidentiality provision." No. 00-CVS-10358, 2003 WL 21017456, at *28 (N.C. Super. Ct. May 2, 2003) (affirming preliminary injunction). The North Carolina Business Court has placed significant weight on plaintiff's hosting of confidential documents on a password-protected server or computer. See, e.g., Addison Whitney, LLC v. Cashion, No. 17 CVS 1956, 2017 WL 1068164 *6–8 (N.C. Super. Ct. Mar. 15, 2017) (granting preliminary injunction concerning misappropriation of trade secrets); Computer Design & Integration, LLC v. Brown, No. 16 CVS 11847, 2017 WL 442691, at *10 (N.C. Super. Ct. Jan. 27, 2017) (granting preliminary injunction concerning misappropriation of trade secret information).

CBI has implemented the same types of protections and more. Klope Decl. ¶26. Its confidential materials at issue are therefore trade secrets.

### 2. Palladino's Misappropriation of CBI's Trade Secrets.

Palladino has misappropriated CBI's trade secrets. "Misappropriation" means "acquisition, disclosure, or use of a trade secret of another without express or implied authority or

consent[.]" N.C.G.S. §66-152(1). The DTSA similarly defines the term to mean "acquisition of a trade secret . . . or disclosure or use of a trade secret without express or implied consent[.]" 18 U.S.C. §1839(5)(A)–(B). A *prima facie* case exists when plaintiff has introduced "substantial evidence" that the defendant "(1) knows or should have known of the trade secret; and (2) has had a specific **opportunity to acquire** it for disclosure or use[.]" <u>Philips Electronics North America Corp. v. Hope</u>, 631 F. Supp. 2d 705, 721 (M.D.N.C. 2009) (cleaned up) (emphasis added); <u>Horner International Co. v. McKoy</u>, 232 N.C. App. 559, 569 (2014) (quoting N.C.G.S. §66-155). CBI need not show that Palladino in fact disclosed or used the trade secrets. <u>Id.</u>

Substantial evidence shows that Palladino acquired CBI's trade secrets when leaving to a direct competitor. Palladino did not have a business need for the documents he downloaded during the month before he departed for the competitive job and did not have permission to take them.

The North Carolina Court of Appeals has upheld several preliminary injunctions involving similar facts in which the defendant had an opportunity to acquire the plaintiff's trade secrets. In <u>Barr-Mullin, Inc. v. Browning</u>, the court held that the former employee established a "*prima facie* case of misappropriation" because the defendant "helped to develop the [] software during his employ" and "had access to copies of the [] source code prior to his resignation." 108 N.C. App. 590, 596 (1993) (affirming preliminary injunction). In <u>Horner International</u>, the court concluded the plaintiff established a <u>prima facie</u> case of misappropriation where the former employee had "knowledge of trade secrets and opportunity to use those in his work for his new employer[.]" 232 N.C. App. at 570 (affirming preliminary injunction).

Other courts in North Carolina have granted preliminary injunctive relief involving evidence akin to CBI's presented evidence. In <u>Addison Whitney, LLC v. Cashion</u>, for instance, the defendants, former employees, accessed company trade secrets in "close proximity to [their]

resignations and their undisputed intent to compete against" the plaintiff. 2017 WL 1068164, at *7 (N.C. Super. Ct. Mar. 15, 2017). The court held that the former employees' "continued access" to trade secrets "when [they] were planning to leave the company and then compete against it 'is precisely the type of threatened misappropriation, if not actual misappropriation, that the [NCTSPA] aims to prevent through issuance of a preliminary injunction.'" Id. at *8 (quoting TSG Finishing, LLC v. Bollinger, 238 N.C. App. 586, 595 (2014)).

Therefore, CBI has shown sufficient evidence to obtain preliminary injunctive relief.

**B.    North Carolina Computer Trespass Statute.**

CBI is also likely to succeed on its claim that Palladino violated the North Carolina computer trespass statute when he acquired thousands of confidential documents without authority and for his personal benefit. See N.C.G.S. §14-458. It is "unlawful for any person [1] to use a computer or a computer network [2] without authority and [3] with the intent to . . . [m]ake or cause to be made an unauthorized copy, in any form[.]" Id. §14-458(a)(5). In relevant part, a person acts "without authority" when he "uses a computer in a manner exceeding the right or permission" given to him. Id. §14-458(a). A violation can occur by intentionally making "unauthorized cop[ies]," even if he "[n]ever actually used the information[.]" CHGYM LLC v. Unify Athletics, LLC, No. 1:21-CV-911, 2022 WL 112208, at *6 (M.D.N.C. Jan. 12, 2022).

CBI's evidence establishes all three elements. First, Palladino used CBI's "computer [and] computer network" to download the 10,023 documents shortly before resigning and starting work with a direct competitor. Second, he acted "without authority" – i.e., "in a manner exceeding [his] right or permission" – by directly violating CBI's Employee Handbook and Code of Business Conduct and Ethics.

Third, there is a strong inference that Palladino acted "with intent" when he accessed and downloaded the files *en masse* during his job offer discussions with and almost immediately after

receiving the offer from CBI's direct competitor. Klope Decl. ¶¶12–14. This is a massive deviation from Palladino's average daily download of zero to fifteen documents per day throughout the rest of his employment. Klope Decl. ¶24.

In an analogous case, the Middle District of North Carolina granted a preliminary injunction based on a plaintiff's computer trespass claim. CHGYM LLC, 2022 WL 112208, at *5–6. The court determined that the defendant, while still employed by the plaintiff, likely obtained unauthorized copies of the plaintiff's confidential materials in the month before resigning and beginning work for a direct competitor. Id. For instance, he generated recurring billing reports and contact lists of the plaintiff's customers, which he had rarely done before. Id. at *3, *5. A "strong inference" existed that defendant accessed the material "without authorization because he did so for an **unauthorized purpose**, that is, for the benefit of third parties—namely, himself in a personal capacity and a competing . . . business[.]" Id. at *6 (emphasis added). In other words, the evidence showed that he acted "in a manner exceeding [his] right or permission" despite having permission to use the plaintiff's computer and computer systems generally. See id.

The North Carolina Business Court has held essentially the same based on the plaintiff's theory that the former employee acted "in a manner exceeding the right or permission granted to him" by "downloading [the plaintiffs'] computer data from the Box Account to his personal device(s)[.]" Construction Managers, Inc. of Goldsboro v. Amory, No. 18-CVS-1359, 2019 WL 2167311, at *5 and *17 (N.C. Super. Ct. May 17, 2019).

Like in CHGYM and Construction Managers, Palladino acted "in a manner exceeding [his] right or permission"—and thus "without authority"—by downloading the confidential documents for an "unauthorized purpose." CHGYM LLC, 2022 WL 112208, at *5–6; Construction

*Managers, Inc. of Goldsboro*, 2019 WL 2167311, at \*17. For these reasons, CBI respectfully requests that the Court grant injunctive relief.

      **C.**      **Interference with Property Rights Statute (N.C.G.S. §99A-1) and Conversion.**

      CBI is likely to prevail on its Interference with Personal Property claim because Palladino acquired a copy of CBI's confidential information with the intent to deprive CBI of the exclusive use of that material. See N.C.G.S. §99A-1. The claim applies "when personal property is wrongfully taken and carried away from the owner or person in lawful possession of such property without his consent and with the intent to permanently deprive him of the use, possession and enjoyment of said property[.]" Id.

      CBI owns the more than 10,000 documents at issue and copies thereof. Mann Decl. ¶22. The evidence shows that Palladino acquired a copy of these documents <u>without</u> CBI's authorization, apparently to upload the copies to his personal cloud storage before going to work for a competitor. Klope Decl. ¶¶13–14, 21; Mann Decl. ¶34. In so doing, he intended to permanently deprive CBI of the exclusive use, possession, and enjoyment of that property.

      Palladino violated the statute by depriving CBI of (1) its <u>sole</u> right to the "use, possession and enjoyment" of its confidential material and (2) its property rights in the copies of its confidential documents. In <u>Bridgetree, Inc. v. Red F Marketing LLC</u>, the district court held that the defendant "deprived Plaintiff of the sole and exclusive dominion and control over the proprietary information" by taking a copy of plaintiff's electronic files. No. 3:10-CV-00228-FDW-DSC, 2013 WL 443698, at \*15 (W.D.N.C. Feb. 5, 2013). "Without the **exclusive right** to dominion over that proprietary information, Defendants wrongfully deprived Plaintiff of true ownership over the property." Id. (emphasis added) (identifying that deprivation of exclusive use suffices for North Carolina conversion claims regarding electronic files).

**D.     North Carolina Unfair and Deceptive Trade Practices Claim**

CBI is likely to prevail on its claim that Palladino violated North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA").  CBI must establish that (1) "the defendant engaged in conduct that was in or affecting commerce," (2) "the conduct was unfair or had the capacity or tendency to deceive," and (3) "the plaintiff suffered actual injury as a proximate result of defendant's deceptive statement or misrepresentation."  Belk, Inc. v. Meyer Corp., U.S., 679 F.3d 146, 164 (4th Cir. 2012), as amended (May 9, 2012).  Under the UDTPA, the term "'commerce' includes all business activities, however denominated[.]" N.C.G.S. §75–1.1(b).  The defendant's intent is irrelevant for a UDTPA claim.  Marshall v. Miller, 302 N.C. 539, 548 (1981).

CBI has presented sufficient evidence to support all elements for its UDTPA claim.  First, Palladino's improper acquiring of valuable confidential information was "in or affecting commerce" under any reasonable reading.  Second, Palladino's acts were deceptive.  Indeed, his DTSA, NCTSPA, and North Carolina computer trespass violations each suffice to form a basis for the UDTPA violation.  See Battleground Veterinary Hospital, P.C. v. McGeough, No. 05 CVS 18918, 2007 WL 3071618, at *8 (N.C. Super. Ct. Oct. 19, 2007) ("[P]roof of an independent tort generally is sufficient to make out . . . a separate UDTPA claim."); Norman W. Drouillard & Print Purchasing Consultants, Inc. v. Keister Williams Newspaper Services, Inc., 108 N.C. App. 169, 171-73 (1992) (holding a NCTSPA violation may also be a basis for a UDTPA violation).   Third, CBI will suffer damages by the diminished value of its confidential material and loss of a competitive advantage that it worked hard to develop over several years.

## II. CBI WILL SUFFER IRREPARABLE HARM IF INJUNCTIVE RELIEF IS NOT GRANTED.

### A. DTSA and NCTSPA violations.

Absent the granting of a TRO, CBI will suffer irreparable harm from Palladino's DTSA and NCTSPA violations. Courts presume a party is likely to suffer irreparable loss from trade-secret misappropriation because the party "may forever lose its competitive business advantage or, at the least, a significant portion of its market share." Barr-Mullin, Inc. v. Browning, 108 N.C. App. 590, 597 (1993) ( "[M]isappropriation of a trade secret is an injury of such continuous and frequent recurrence that no reasonable redress can be had in a court of law." (cleaned up)); see also, e.g., Armacell LLC v. Bostic, No. COA09-1160, 2010 WL 2816355, at *15 (N.C. Ct. App. July 20, 2010) (finding it to be "well settled" that misappropriation of trade secrets causes harm that is properly remedied by injunctive relief). For this reason, the North Carolina legislature endorsed the granting of injunctive relief for misappropriation of trade secrets in the NCTSPA itself. See N.C.G.S. §66-154(a).[5]

### B. Other North Carolina Claims.

Absent preliminary injunctive relief, CBI will suffer irreparable harm from Palladino's continued access to its confidential documents, whether due to trade-secrets violations or the other state-law violations. Like the DTSA and NCTSPA violations, the other state-law violations can result in a plaintiff "forever los[ing] its competitive business advantage or, at the least, a significant portion of its market share." See Barr-Mullin, Inc. v. Browning, 108 N.C. App. 590, 597 (1993).

---

[5] "[A]ctual or threatened misappropriation of a trade secret may be preliminarily enjoined during the pendency of the action and shall be permanently enjoined upon judgment finding misappropriation for the period that the trade secret exists plus an additional period as the court may deem necessary[.]" N.C.G.S. §66-154(a).

In fact, in <u>Construction Managers</u>, the North Carolina Superior Court granted, and the North Carolina Business Court extended, the plaintiffs' motion for TRO based on computer trespass and trade-secret misappropriation (and certain other claims). <u>Construction Managers, Inc. of Goldsboro</u>, 2019 WL 2167311, at *5; (ECF Nos. 8, 11). For both claims, the Court held that the plaintiffs were likely to suffer irreparable harm "if Defendant is permitted to copy and/or disclose the proprietary, confidential information and trade secrets . . . for Defendant's own personal use, and/or that of Defendant's new employer[.]" (<u>Id.</u>) The same irreparable harm would follow based on Palladino's unfair and deceptive acts and interference with CBI's property rights.

Therefore, preliminary injunctive relief is necessary to protect CBI from Palladino's violations of North Carolina's computer trespass statute (N.C.G.S. §14-458), interference with property rights statute (N.C.G.S. §99A-1), and UDTPA (N.C.G.S. §75-1.1).

## III.     THE HARM TO CBI OUTWEIGHS ANY HARM TO PALLADINO.

CBI would suffer great harm without injunctive relief, while Palladino would suffer little or no harm from an injunction. CBI plainly needs to keep its trade secrets and other proprietary and confidential documents away from competitors, and Palladino has no right at all in them. Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." <u>Title Trading Services USA, Inc. v. Kundu</u>, No. 3:14-CV-225-RJC-DCK, 2014 WL 1765128, at *3 (W.D.N.C. May 2, 2014) (quoting <u>Winter v. Natural Resources Defense Council, Inc.</u>, 555 U.S. 7, 24 (2008)). The evidence shows and the case law supports that Palladino's trade-secret misappropriation, computer trespass violations, and other state-law violations will cause <u>irreparable</u> harm to CBI.

In <u>Advanced Instructional Systems, Inc. v. Competentum USA, Ltd.</u>, the court determined that the plaintiff would "undergo significant hardship if [the defendant] is not prevented from using

[the plaintiff's] trade secrets to launch a competing software suite and likely steal a valuable client." No. 1:15-CV-858, 2015 WL 7575925, at *5 (M.D.N.C. Nov. 25, 2015).

Enjoining Palladino from using or disclosing CBI's confidential, proprietary, and trade-secret information would be "minimally invasive" to him. See CHGYM LLC v. Unify Athletics, LLC, No. 1:21-CV-911, 2022 WL 112208 (M.D.N.C. Jan. 12, 2022). Palladino, after all, has no right to CBI's property.

Furthermore, enjoining Palladino temporarily from employment with Obsidian on the grounds that he will inevitably disclose CBI's trade secrets and confidential information imposes far less harm than would permanently befall CBI absent injunctive relief. See Advanced Instructional Systems, Inc., 2015 WL 7575925, at *6 (determining that "it is far less clear what harm will befall [defendant] . . . [where] there is no evidence that time is of the essence . . . or that [defendant] will lose any current business opportunities by the issuance of a temporary injunction"). This is especially so because, like the defendant in Advanced Instructional Systems, CBI approached Palladino with a chance to explain before filing suit but Palladino was "unable or unwilling" to explain himself. Advanced Instructional Systems, Inc., 2015 WL 7575925, at *6.

Even restricting business operations can be appropriate where a competitor "unfairly" and "greatly benefitted" from another's trade secrets. See Arminius Schleifmittel GmbH v. Design Indus., Inc., No. 1:06-CV-00644, 2007 WL 534573, at *7 (M.D.N.C. Feb. 15, 2007).

## IV. THE PUBLIC INTEREST FAVORS GRANTING PRELIMINARY INJUNCTIVE RELIEF.

The public interest is served by ensuring that businesses can "share confidential and proprietary information with its employees without fear it will end up in the hands of a competitor." Philips Electronics North America Corp. v. Hope, 631 F. Supp. 2d 705, 724 (M.D.N.C. 2009) (citing Travenol Laboratories, Inc. v. Turner, 30 N.C. App. 686, 691 (1976)). In addition, "the

public interest favors the protection of trade secrets." Advanced Instructional Systems, Inc. v. Competentum USA, Ltd., No. 1:15CV858, 2015 WL 7575925, at *6 (M.D.N.C. Nov. 25, 2015) (quoting Forestry Systems, Inc. v. Coyner, No. 1:11CV295, 2011 WL 1457707, at *2 (M.D.N.C. Apr. 15, 2011)). It also calls for "preventing unethical business behavior." Id. (quoting Philips Electronics North America Corp., 631 F. Supp. 2d at 724).

## V. CBI SEEKS INJUNCTIVE RELIEF NECESSARY TO PROTECT ITS SERIOUS AND LEGITIMATE INTERESTS.

### A. Temporarily Enjoining Palladino from Using or Disclosing CBI's Confidential Information and Requiring Palladino to Return Such Information is Critical.

Palladino, and anyone acting in concert with him, should be ordered to: (1) refrain from using or disclosing any CBI property, including copies thereof, for any reason whatsoever and (2) return all such CBI property immediately. The injunctive relief is the first essential step to prevent use or disclosure of CBI's confidential, proprietary, and sensitive business information. See Barr-Mullin, Inc. v. Browning, 108 N.C. App. 590, 593 (1993); Addison Whitney, LLC, No. 17 CVS 1956, 2017 WL 1068164 *12 (N.C. Super. Ct. Mar. 15, 2017); CHGYM LLC v. Unify Athletics, LLC, No. 1:21-CV-911, 2022 WL 112208, at *10 (M.D.N.C. Jan. 12, 2022).

### B. Temporarily Enjoining Palladino from Employment with Obsidian Is Appropriate and Necessary Under the Circumstances.

Palladino should be enjoined temporarily from working for Obsidian based on his trade secret misappropriation, computer trespass, and other violations. Under the inevitable disclosure doctrine, trade secret misappropriation can occur when "defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." PepsiCo, Inc. v. Redmond, 54 F.3d 1262, 1269 (7th Cir. 1995). "[W]hen an employee who knows trade secrets of his employer leaves the employer for a competitor, and, because of the similarity of the employee's work for the two companies, it is 'inevitable' that he will use or disclose trade secrets of the first employer[.]"

Spirax Sarco, Inc. v. SSI Engineering, Inc., No. 5:14-CV-519-F, 2015 WL 1810093, at *5 (E.D.N.C. Apr. 17, 2015) (quoting Analog Devices, Inc. v. Michalski, 157 N.C. App. 462, 470 n.3 (2003)).

In Merck & Co. v. Lyon, the court forecast that the Supreme Court of North Carolina would recognize the inevitable disclosure doctrine under certain circumstances. 941 F. Supp. 1443, 1460 (M.D.N.C. 1996); see Spirax Sarco, 2015 WL 1810093, at *5. The circumstances would include an injunction "limited to protecting specifically defined trade secrets" that are "clearly identified and of significant value." Merck & Co., 941 F. Supp. at 1460. "[T]he degree of similarity between the employee's former and current position[] and the value of the information" could show a likelihood of disclosure. Id.

Courts consider various other factors as well:

(1) the circumstances surrounding the termination of employment; (2) the importance of the employee's job or position; (3) the type of work performed by the employee; (4) the kind of information sought to be protected and the value of the information; (5) the degree of competition between the former and new employer; (6) the new employer's efforts to safeguard the former employer's trade secrets; (7) the former employer's lack of forthrightness in his activities before accepting his job and in his testimony; and (8) the degree of similarity between the employee's former and current position.

Spirax Sarco, 2015 WL 1810093, at *5. The court also considers whether the likelihood of the defendant's disclosure of the information is high. Allegis Group, Inc. v. Zachary Piper LLC, No. 12 CVS 2984, 2013 WL 709581, at *11 (N.C. Super. Ct. Feb. 25, 2013).

Here, Palladino's conduct warrants invoking the doctrine. Palladino left CBI to work as an officer for a direct competitor in the same business offering the same services, and his new position appears to be the same. Both roles require Palladino to develop the same types of business relationships with the same contacts. The evidence shows he took thousands of documents containing key business strategy and terms. He was also privy to CBI's trade secrets, relationships,

and business strategy and operations. He had extensive and intimate knowledge of CBI's strategic goals, which goes beyond "generalized" knowledge. See PepsiCo, 54 F.3d at 1269. In addition, he exhibited a "lack of forthrightness in his activities before accepting his job" with Obsidian: he did not tell anyone at CBI that he was leaving for weeks. And he did not disclose that he was going to Obsidian until after he resigned.

Nevertheless, CBI does not ask the Court to enjoin Palladino from "any and all" employment with Obsidian. Rather, CBI asks the Court to enjoin Palladino, and all others acting in concert with him, from working in a role at Obsidian that would inevitably lead to using or disclosing CBI's trade secrets. Invoking the inevitable disclosure doctrine is critical to preventing Palladino and others from using and disclosing CBI's confidential information.

## CONCLUSION

For the foregoing reasons, CBI respectfully requests that this Court grant its Motion for a Temporary Restraining Order and Preliminary Injunction.

Dated: August 18, 2022.

Respectfully submitted,

By: s/ John A. Zaloom
John A. Zaloom (N.C. Bar No. 30557)
Fielding E. Huseth (N.C. Bar No. 53121)
Katherine C. McDiarmid (N.C. Bar No. 54791)
Elizabeth A. Weisner (N.C. Bar No. 55029)
MOORE & VAN ALLEN PLLC
100 North Tryon Street, Suite 4700
Charlotte, NC 28202
Telephone:     (704) 331-1000
Fax:              (919) 416-8380
johnzaloom@mvalaw.com
fieldinghuseth@mvalaw.com
katherinemcdiarmid@mvalaw.com
elizabethweisner@mvalaw.com

*Attorneys for Plaintiff*